Okay, we'll hear our next case, Host International v. Marketplace PHL, number 20-2848. Good morning, Your Honors. My name is Tom Goldstein. I represent the appellant host, and with the Court's permission, we'll reserve three minutes for rebuttal. That'll be granted. The Court has before it both a motion for an injunction and the merits of the appeal. We could talk about either one. With no preference from you, I'll start with the merits of the appeal. Marketplace adopted an archetypical tying agreement that said, we'll lease you space at PHL, but you're going to have to sell Pepsi. We sued them under the antitrust laws, and one way of proving our antitrust case is to show that they have market power. And one piece of that inquiry is that there is a geographic market. So that's the market in which they have market power. The District Court said that we, as a matter of law, could not plead a geographic market because we buy leasing space around the country, and that's a legal error. The question that the Court should have asked is, do participants in the market, the purchasers, purchase somewhere else outside the geographic market in a way that is a substitute for what's being bought here and in a way that constrains their ability to impose any competitive conditions? That is the saying. Counsel, just one preliminary question. Beyond its relevance to standing and injury in the antitrust context, does the merits of the legal sufficiency of your pled tying claim matter? In other words, if we thought that there wasn't a sufficiently pled tying claim as a matter of Section 1, does that matter in the procedural posture in which this appeal comes to us, or is that for a later adjudication? Well, it would not matter for a couple of reasons. We have multiple different claims. We do have the agreement-type claim. We have the claim that they imposed the tying requirement independently. The Court, of course, does have the power to affirm on alternative grounds, but its strong tendency has been to take the case as it is decided by the district court and leave other things for later decision below. In addition, I don't need to take the argument that this is an insufficiently pleaded tying claim even really to be a strong argument by the appellees for affirmance. I think one in determining a geographic market and determining standing assumes the validity of the underlying antitrust claim. So with respect to the district court's error, we think that the district court needed to ask and look to why it is we ask if there's a geographic market, and that is we're trying to figure out if there's someplace else that participants in the market will go and buy the thing that will constrain here a marketplace from imposing the anticompetitive condition. And the district court thought the fact that we lease space in Toledo, in Los Angeles, or in Portland would somehow constrain marketplace from imposing something anticompetitive in Philadelphia. That's wrong as a matter of common sense, and it's wrong as a matter of law. The case has kind of gotten diverted into a debate about whether you can have a geographic market at an airport or an individual facility, and there are arguments from the other side for affirming on the ground that, you know, if you were the lessor of someplace, you get to do basically whatever you want. We think the straightforward way of resolving the case is to tell the district judge that the test that the district court used for determining geographic market power was wrong, that the fact that we do lease around the country isn't what determines whether there's a constraint on marketplace in imposing these conditions, and then let the district court move on in the case. There isn't, I think, some strong reason for attempting to resolve the other arguments that are made for affirming because the complaint is sufficiently pleaded. All we have to do is show that it is plausible that there's a geographic market here. How many airports does marketplace control? Marketplace controls, I don't know the exact number, Your Honor, but it is multiple ones. We have in the injunction. I thought it was three, maybe, or maybe I'm misremembering. Well, you may be taking that from the injunction motion because they are threatening us. If we don't abandon this appeal, they are threatening us with respect to leasing all over the place, well beyond the Philadelphia airport. The claim, of course, relates to what it is they're doing with respect to tying. We had two specific leases where we had the terms agreed to with them, and then they told us that unless we sold under the pouring rights provision. I'm just trying to get a sense of their market power. I mean, it seems like hosts, I think you're in 120 airports? Yeah, roughly so. It seemed like in terms of who's the big guy and who's the little guy here, your host seems like the big guy and Marketplace seems like the little guy, but perhaps that doesn't matter. But what does seem significant to me is I didn't see any case anywhere that says one airport constitutes a relevant geographic market. And what I'm thinking sort of hypothetically is if Marketplace controlled the leasing at every airport on the Eastern Seaboard, for example, you know, it's a very different case. And I'm also wondering, is Starbucks a Coke company? Is that why you have a problem here, because you want to pour Coke and not be stuck pouring Pepsi? Well, this is a major issue for us with respect to wherever it might arise. It's true that we have a Starbucks here. We also have a local resident. Is Starbucks a Coke company? I don't know that Starbucks has a nation. I don't know that it would be impossible for us to sell Pepsi-Cola products. Does Starbucks have any agreements with Coke? I do not know. It's not in the record, right? For the exclusion of Pepsi. The record doesn't describe that. I'm sorry to say. But can you tell us why Starbucks was so averse to pouring Pepsi? Oh, because it reduces competition. Your Honor, if we don't have – and remember, just to be clear, it's not just Coke and Pepsi. It's the product lines of those entire companies. Right, sure. Yeah, there are a multitude of products. And the complaint is? So what that means to the consumer is if I like a Coca-Cola instead of a Pepsi-Cola, I go to Starbucks, I can't get my Coke. I have to drink Pepsi. Oh, well, Your Honor, as the complaint explains, there are studies that show when you impose these pouring rights agreements and therefore you don't have both choices available, then purchasing reduces by approximately 30 percent because there are people who really like their lines of products and they won't buy anything at all. I mean, if you're a Coke person and you're offered a Pepsi, very frequently you would just say, I'll take neither one. So there are real economic effects. That is, I don't think there's anything in the case before you right now that would cause it to be disposed on this ground. To go to your point about, you know, are we the bigger player here or are they? Well, forget that because I'm not sure that's important. Right. Because a little player could exert tremendous market power. Exactly. I think we have a right. The bigger issue for me is you're relying on DOJ stuff about, you know, vetting mergers and things and sort of policing preemptively the antitrust playing field, but I don't see any case law. You seem to be asking us to be sort of the first court to say that one airport is a relevant geographic market rather than all airports in the country or all airports in a certain part of the country. Well, remember, it's actually the reverse of that. The other side is asking you to say that it's a matter of law. It is impossible to plead that a single airport is a geographic market. We're not asking you to determine it's a matter of law as it is. We are at the pleading stage. The district court held on this ground that we think is incorrect. They're asking you to affirm on the alternative ground. The second point I'd make is this notion about the airport being the single geographic market is a little bit of an optical illusion. Let me explain why. And that is what you want to know is where is there some substitute for what they're selling. We could say the geographic market is Philadelphia. The product market here, and the district court accepted it, and the other side is not appealing from that, the district court accepted that the product market here is airport leasing concessions. There are specific lines of businesses that are directed at that particular product that we lease from them. And you could say the geographic market is Philadelphia, and the only airport at which this is offered is the Philadelphia International Airport. The only reason we defined the market as PHL is that the law says you define the geographic market as narrowly as possible, so we pick the actual airport. But you could just say that the geographic market, and if you remanded the case, we could amend the complaint to say this, the geographic market is Philadelphia, and there are no substitutes. You just ask, okay, if on the hypothetical that we think that marketplace is existing is the hypothetical monopolist, which is the test, over this geographic market, say it's Philadelphia, what are the substitutes? Where would we go in a way that would say to marketplace, look, if you put this tie agreement in, we're just going to go somewhere else, and that will constrain them not to do it. Well, isn't the answer, you could lease space all around Philadelphia, and presumably, I'm not a coffee drinker, but I assume that there are a multitude of Starbucks around greater Philadelphia. So you might have, I don't know, let's say you have 30 Starbucks within a 50-mile radius of where we are right now, so you could have 49 of them selling all manner of products, and then you have one store at the airport limited to selling Pepsi products. That sure doesn't look like an antitrust problem. Well, I want to be attentive to my time. A couple of things about that. Of course, the consumers that we're selling to can't take that Starbucks from somewhere else into the airport. Sure they can. They just can't go through TSA with it. They could go into the airport and sit. You know, if I'm a real Coke enthusiast, I get my Coke, I take it to the airport, I sit there, and I enjoy it, and then at the last time, moment, I go through TSA. I don't drink anything on the other side because I'm really upset that PhL is a Pepsi place. I can tell this really has gotten to you, and our friends at Coca-Cola appreciate that. This is the problem with not being a coffee drinker. But let me just say the second answer I would give, and I do want to be attentive to my time, is that you have described a set of arguments that could be made. You said you could say, and that's kind of our point, that this is a very fact-bound inquiry. The question that you are asked is, is it as true as a matter of law that we cannot plead this case, that we couldn't prove the opposite, that it's really important for people to be able to purchase drinks inside the airport, for example, and that nobody does go to a Starbucks that's three miles away? If you could plead the case, there would be at least one or five or probably 30 cases that say something like one airport is a relevant geographic market, and there are no such cases. There are a couple of airport cases. We've got the couple out of the Tenth Circuit, right? The Holmes-Tempkowitz concurrences and the McConnell opinion, and, I mean, they really don't help you. Oh, Your Honor, I think the Sixth Circuit case is pretty good, and I would hesitate with respect, Your Honor, to be dismissive of the DOJ's position on this question because whatever rule you are adopting will have enormous consequences, for example, for landing slots and other things that are offered at airports that are closed. Well, I don't know. I think I would hope if we did rule against you we wouldn't write something that affected the ability to purchase tickets and airline tickets. I mean, you would concede, wouldn't you, that the pricing in what appears to be perhaps an oligopolist environment in terms of airline choices is quite different than, you know, buying sandwiches and drinking beverages at an airport. Those are two very different things. Well, that's also a very different opinion that even the other side has asked you to adopt, right? That gets quite into the nature of the merits of the claim as opposed to what you said, Your Honor, which is that there are no cases saying airports are geographic markets. That rule would apply more broadly than just this case, for sure. I have two questions for you on different topics. One is, you know, we're always concerned about our own jurisprudence. You cited our town sound en banc opinion frequently, but I'm wondering if the Illinois Tool Works Supreme Court opinion thereafter abrogated our rule of reason and tying claims jurisprudence in that case. Your Honor, I don't think what the Supreme Court has said is that, you know, the market power requirement with respect to tying claims is very light. It has not said that there is now a rule that says in rule of reason tying claims you do have to prove market power. The law is in an area of evolution, I think is the fairest point. And that's why we have focused on the argument that the district court simply got wrong to test for what the geographic market is. It raises a difficult question that we don't think it's necessary for you to decide whether there is a requirement of proving a geographic market in a rule of reason tying case just as there is in a per se case. My other question deals with your injunction application. And I am at a little bit of a loss to understand how there's irreparable harm. Isn't this, isn't what you're saying, can you remedy that by money? Well, it's true in the sense that essentially there's never irreparable harm in the context of an antitrust case, that there's always financial injury. That really has not been regarded as the law, we think. If we are present, there is the public interest that I think is the relevant irreparable injury, Your Honor. Remember, for purposes of the antitrust laws, the concern here is that they are requiring us to abandon an antitrust claim. And this court has recognized that there is a broader public interest in that. For example, the downstream consumers who we act on behalf of under Illinois BRIC, under the federal antitrust laws. And so there is an irreparable injury in that respect at the very least. Okay. Go ahead, Tom. They're requiring you to abandon your claim. I thought, you know, they just offered you space, and you didn't like their conditions. And so it was your decision not to operate at the airport, went on to in Starbucks because you didn't want to submit to the Pouring Rights Agreement. I had taken the, Judge Ligaris, to move on to the injunction motion. We had this subsequent development that's described in the injunction motion that said, if we don't abandon this lawsuit. I thought we had just changed gears. I see. Yeah. No, I'm sorry. Yeah. Right. Your point is that they should be willing to deal with you even on their terms and not require you to forfeit a litigation right that you might have. Yes, Your Honor. Okay. All right. Judge Mayne. One of the, because this is pled as a tying claim, we have a circumstance that I think doesn't appear often in the cases, which is that there's two separate products, right? There's tying, the retail space at the tie, which is the beverages. So, and you're basing the proposed geographic market on the tied product. Why is that the right standard? Why not use the geographic space, the geographic definition for retail space? Well, there's a little puzzle in antitrust law that is when the law says in a tying claim that you can prove an anticompetitive effect in the tied market. That is to say, the beverage market. But when you state the claim, as opposed to identifying what the anticompetitive effect is, when you state the claim, you are supposed to identify, the case law says, the geographic market of the tied product. And the reason you do that is because you're trying to figure out where their leverage is. Right? And their leverage is in the tie, the original leasing market. That's what gives them the power to impose the anticompetitive condition. All that the case law is concerned with is that there be some harm in the other market, in the beverage market. But the question antitrust laws are asking in the first place is, can they make us do this? Can they make us agree to the tie, to the pouring rights provision? And then we ask, you know, in the merits of the claim, whether we've proved an injury with respect to the beverages. And we intend to do that to show that people buy, you know, fewer drinks when they don't have choice and there's less competition. But the product here, the product you want is airport retail space. That's right. And I had taken the question to be, do we also have to prove or should we instead be proving that they have market power with respect to the beverages? And the case law asks, I think quite rightly, no, no, no, no. You don't need to do that. Exactly. They obviously have a hammer lock on the retail space. It's one landlord and one landlord agent leasing the space, right? That's undisputed. Yes. Thank you. Okay. Good morning. Good morning. Leslie John on behalf of the Appellee Marketplace, PHL. May it please the court. HOST brought this suit to challenge an exclusive beverage arrangement. Despite their widespread use at sports stadiums, municipal buildings, amusement parks, and airports, no court has ever found that such agreements violate the antitrust laws. To the contrary, every court that has considered such an exclusive arrangement, including the Fifth, the First, and the Seventh Circuits, has concluded that these do not violate the antitrust laws for the same reason. But that goes to the merits, not knocking them out for lack of antitrust standing, right, or lack of relevant geographic market. Don't we have to deal with that initial question? Well, we do have to deal with the initial question about whether there is a properly pled geographic market. And here, the plaintiff in a tying case has the burden to show, to allege, that there is a viable geographic market for both the tying and the tied product market. And this is where HOST has absolutely failed to do that. They say for both the tying, the tying market being the lease space, and the tied market being the non-alcoholic beverages, that PHL itself, the venue, the airport venue, inside of TSA boundaries is the geographic market. And that simply is not a viable market. No court has held in the, for the tying market, let's consider the airport lease space. There is no airport that, there is no case finding an airport to be itself, to be a viable geographic market. How many airports does Marketplace act as the landlord's agent? Four airports. Which ones? So you have Boston, Philadelphia, Dulles, and Reagan. And could you require only Pepsi products to be poured at all four airports? Do you require that? There is no such requirement in Boston. I believe there is a recent requirement in Dulles, yes. And I'm just wondering, you know, it would seem to be a problem. If you had, if you controlled all the airports on the eastern seaboard and you only allowed Pepsi products in your airports, that would certainly be an antitrust concern, wouldn't it? That would be a different case than what we have in Boston. I know, but I'm asking, wouldn't it be an antitrust concern, or do you think it wouldn't? Would you say it's not? There could conceivably be an antitrust concern if there were adequate allegations that that somehow is a viable geographic market. Here there are no allegations about any geographic market other than the fact that they think the TSA boundaries in Philadelphia should be an adequate geographic market. And despite the fact that they had multiple opportunities to do so, they've never abandoned that geographic market. Although we did hear for the first time today, counsel suggested maybe Philadelphia could be a geographic market. But if that was so, their rule of reason tying claim, as well as their general restraint of trade claim, both of which are based on a tied product market of non-alcoholic beverages, would clearly fail. Any sale of beverages at the airport is going to be dwarfed by the sale of non-alcoholic beverages throughout the Philadelphia region, where there is vigorous competition between Coke and Pepsi to be either the beverage of choice. Coke, if you happen to go see a Phillies game, is the beverage of choice, or you happen to be at the airport where it happens to be Pepsi. Is there any distinction we should take cognizance of, by virtue of the fact that you're very much a captive audience once you go through TSA? I mean, you go to a Phillies game, it's different. You know, you can come and go. It does seem, it's certainly different, and I'm wondering if it's a difference in degree only or a difference in kind. It seems to be a difference in kind. I mean, there are a lot of things that we do at airports that we have to do for safety that we're not required to do elsewhere, right? I don't believe it's a difference in kind. And so, for instance, if you look at Judge Wood's decision in the Elliott case, which is talking about the United Center, people don't generally go into sports stadiums, go through security, have all their food and drink confiscated. They're watching a game. They go for the entertainment. They're not going to come back out. We were talking about that earlier. I don't know, the games I've been to recently, I sometimes wonder if people just go for the food and the drink. I mean, there's a lot of eating and drinking at our sports venues, right? Well, in all this family, true. I confess, you know, I'm married to a foodie, and I'm kind of astounded at the consumption at sporting events of stuff that, you know, my wife would be very disappointed if I ate. So, I mean, how do we know? That seemed to be kind of an offhand comment, certainly by an outstanding jurist. But, I mean, people do eat and drink. I mean, the revenues from these arenas are astounding in terms of concessions, are they not? Yes, but the issue is for all of these kinds of venues, there are barriers in the courts recognizing. Well, is it fair to group them all together, though? I think what Judge Hardiman is getting at is, is an airport the same as a convention center or a sporting event? I believe with respect to purchasing, we're talking about purchasing soda and snacks and gum. I think, yes, for those purposes, the venue is absolutely the same as a sports stadium or a university where people are going to that venue for some reason and then may happen to be purchasing their soda and visiting various concessions. Because, for instance, and the reason why that's true is, if I'm very interested, in fact, in going to Starbucks, let's say, and I know I'm going to the airport, I can visit my hotel lobby that may have a Starbucks there and get Starbucks there. I can go to the Starbucks on the way to the airport. I can decide I'm going to wait until after my flight and go to Starbucks at my destination. There are all various choices that that passenger has about where they're going to get the product, what product they're going to get. And so the choice, the cases don't confine it to the choice that's made once you enter the venue, once you enter the piece of property. When you go into a restaurant, you know that your choice of beverage is limited by what that restaurant offers. You know when you go to a Phillies game, your choice is limited to the Aramark concessions that may be there. The same is true if you go to Lincoln Financial Field. But that doesn't mean that's the relevant area of competition. The relevant area of competition is all of the places that that patron could visit in the geographic area. The geographic area, for instance, is Philadelphia. They could be visiting their coffee shop or their Starbucks. But the problem here, as alleged, though, is that if there are 100 places to buy food and drink at PHL, you're stuck with Pepsi products. So you really don't have any consumer choice in that regard. But that's no different than, let's say, you go to an amusement park. Let's say you go to Disneyland where Coke, which has a longtime arrangement with Coke, and Coke is the only one poured. Once you get there, that's it. You want us to just follow a fairly substantial body of cases that say when somebody owns a facility, whether it's Disney World or Deer Valley Ski Resort or your Italian restaurant down the street, they get to pour and serve whatever they want. And that's not an antitrust problem. I think that's exactly right. You just want a clear statement from this court to that effect. A clear statement. And I think also if you look at the allegations in this complaint as to what is the geographic market, incredibly bare bones here. All they say is all we have to show is that there are TSA boundaries and that's enough. I don't think that that's enough. But what about the concern Mr. Goldstein expressed? If we make a clear statement that the Philadelphia airport on its own can't be a geographic market for antitrust, does that have ramifications for, you know, landing rights, jetways, all of the other things associated with airline traffic? Those are separate product markets. I don't think the court necessarily needs to go that far to make a statement for all various product markets that could be offered at an airport. I think all the court has to do is look at this complaint and say the allegations here are not viable. They're not plausible. I also think, however, if the court were to go in the other way, you have the argument that, okay, we have pouring rights provisions all around the country in every kind of conceivable venue. Quite frankly, that's how Coke and Pepsi choose to compete with one another. Are we, you know, are we going to establish precedent that suddenly calls all of that into question? Would it do that, though, counsel? Because one of the interesting questions about these retail space cases is this concept of holistic experience. You see this in the Christie case. You see this in some of the sporting venue cases. Judge Hardiman was asking this question, right? You're going for a multitude of purposes that we can call experience, whether it's education at a university, attendance at a sporting game, skiing at a ski resort. There's a whole package of things that you're looking to experience, and you can choose where you want to sell your goods or services based on what kind of experience you want to buy into. Is an airport the same as all of that? Because I don't think that consumers in the retail space market are thinking about an airport the same way they would think about college campus or a ski mountain, right? Because the secondary level of consumers, the travelers, are rarely making their decisions based on experience. They're going based on destination and where the hubs are located and have to go. So there's an element of them being captive in a way that most secondary consumers aren't. So does that change this a little bit? Because I know you want to analogize this to a mountain or a university, but the courts there seem to be focused on the idea that, well, you're not going to those places based on the things that are being sold. It's not relevant to your experience, but it's the bigger experience that helps define the market. So help me understand why this is the same as those experiences. So, for instance, again, if you look at Judge Wood's decision in the Elliott case, she talks about the fact that patrons are going to that center in Chicago for sporting events and other kinds of entertainment, that they're not going there for food and drink or, in that case, whether they were going to eat peanuts. And that was relevant to her concern and the concern that, you know, is that any different here? So, for instance, travelers going to the Philadelphia airport to catch a flight are no different than that patron in Judge Wood's case that is going to the United Center to watch a game and then happens to be purchasing some sort of food and drink. I think they're very similar. And if you look at Judge Timkovich's concurrence in the Getaway case, you'll see that he finds the rationale of the Krispy Sports case, which is the ski resort case, to be very compelling and to apply it to the airport case. So he did not find that there was a distinction between that kind of venue and the venue that we have here. And I would submit that the way he approached that, I think, is applicable to our case here. I asked your adversary about our Town Sound case and whether it was abrogated by Illinois Tool Works with respect to rule of reason tying claims. What's your position on that? Right. So I do think that there is some overlap there. And so I do think that in Illinois Tool Works, the court was very clear to say that over the years while tying has been viewed under the stricter per se lens, now we realize that our disapproval has been substantially diminished and that tying often does serve good purposes. Well, I think the quotation is, in all cases, this is Illinois Tool Works, in all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product. Yes. Yes. And so I do think, and as a consequence of that, must plead a viable market, which includes both a product market and a geographic market. So I do think absolutely there has to be a showing of market power, which is dependent on showing that there is some viable market, that the power is being exercised in here. In this case, I think we have the antithesis of market power, because when Marketplace said we'd like you to agree to the pouring rights provision as a condition to leasing this space, response was to simply walk away and say, no, we don't want the space. So I think we have the very antithesis of tying in this case, because they're not being, they clearly weren't forced to agree. I don't understand that argument, because it seems to me you exercise complete market power, at least as to PHL. You know, there are myriad airports in the country. You don't have deep penetration into many of them. You sit four. But at PHL, you're the only game in town, and you call the shots. But if you're host, you operate at 120 airports across the country. You're looking at leasing space at 120 airports and more across the country. And if you find conditions at one airport not to your liking, and you're host, and you're one of the largest concessionaires in the country, you go to another airport, which is exactly what hosted here. So did Illinois Tool Works abrogate our town sound opinion? Well, what I think it does is it makes it clear that the plaintiff must plead a viable market and a viable tying market, that there is no presumption of market power under any circumstance. In that case, of course, in Illinois Tool Works, it was a patent, that there is no presumption of market power in any tying case. And thus, it is incumbent on the plaintiff to prove a relevant product and geographic market in every single tying case, which, as this court has held, applies both to the tying market and the tied market. Okay. Tommy, anything else? Thank you. Thank you, counsel. Thank you, Your Honors. The one thing we didn't hear from the other side was any defense of the district court's ruling. Right? There is no argument that's being made here that the district court got this right when it tried to determine whether there's a relevant geographic market in the tying product here, airport leasing, that it matters that we lease around the rest of the country. Nobody thinks the fact that we can go to Cleveland affects their ability where they have their only game in town in Philadelphia, their ability to impose the pouring rights condition. The other side's argument has now evolved into the idea that they can disprove the existence of a geographic market in the tied product, the beverages. But that's not what we have to prove. We don't have to prove that they have market power, that they have monopoly in the tied market. What we have to do is prove there's some effect there. That's all that we have to show. And nobody doubts that we can do that or that we pleaded it. Remember, this is just a pleading question. Now, in antitrust cases, like other kinds of cases, there is this tendency, this interest, to tackle a lot of very interesting questions in cases and to say, for example, we could have a very clear rule that says, you know, if it's your building, you can do whatever you want. But we have given you really good reasons to let the district court take this case one step at a time because of the possible collateral consequences. Remember, if you were to hold that airports cannot be a geographic market and they are leasing us concession space, they lease slots for being able to land the airplane, jetways, all kinds of things, that is problematic. That rule is dangerous, and I don't think that the court wants on pretty thin briefing where the district court hasn't decided it to just go out and reach that question. Assume we agree with you that that would be dangerous. What's dangerous about saying one airport for purposes only of retail space can't be a relevant geographic market for antitrust? Well, I just don't understand what the reasoning – it would depend on what the opinion says. Well, I'm extricating all of those other parade of horribles that I actually, you know, find some credence in would be horrible, right? I mean, it would be sort of strikingly overbroad for this court to say anything significant about landing rights and gates, assignments, et cetera, in a case that really involves the eating and drinking establishments within one airport. Well, Your Honor, the question is how you'd extricate them. When my friend was asked that question, she said she would extricate them on the basis of the tied product, the beverages. But that's not what the issue in the case is. How would you say that there is not a geographic market with respect to tying? I don't understand what the legal theory would be that says, okay, there's no geographic market because the fact that we can buy in Toledo will constrain marketplace in their leasing of retail space. But the fact that you can land an airplane in Toledo, that American Airlines operates in more places than Host does, of course, will somehow not constrain them in how they treat landing slots. I just think it's a – Well, why wouldn't it be as simple as saying there are a lot of airports in the country and if a landlord has exclusives in any manner of retail arrangement, not just pouring rights, and that landlord only controls a few airports, then there are a lot of other places one can go if one doesn't like the exclusive. Well, Your Honor, I don't – where – the question under the law, the reason we're asking about geographic market power, is we're asking where can we go, Host, that will slow marketplace down from imposing an anti-competitive condition. The answer to that question is, I think, nowhere. There is not – they haven't given you any reason to think the fact that we operate in other places would cause them to behave any differently in Philadelphia. And if I could just identify one other distinction between these facilities that have a single vendor. Remember, they're creating a market. They're the ones who have different people competing for these 170 concession spaces within the Philadelphia airport. It's not a situation like Disney is operating its own place. There is an intermediary, and that intermediary is an entire market in the economy. We have competitors for what we do. And so I would hesitate before just extending the case law and just ignoring the existence of that market that's in the middle there. Okay. Thank you, Counsel. Thank you, Counsel. We thank Counsel for their excellent briefing and argument today. We'll take the case under advisement. We wish all here in the courtroom good health, and I'll ask the crier to adjourn court for the day. Thank you. Thank you.